UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA O'DELL, HANNAH BAILEY, HOLLY ZIMMERMAN, and LAUREN MILLER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AYA HEALTHCARE, INC.,<br><br>Defendant. | Case No.: 3:22-cv-01151-BEN-BLM<br><br>**ORDER:**<br><br>**(1) GRANTING-IN-PART MOTION TO COMPEL ARBITRATION; AND**<br><br>**(2) DENYING EX PARTE APPLICATION WITHOUT PREJUDICE**<br><br>**[ECF Nos. 21, 29]** |

**I.   INTRODUCTION**

Plaintiffs Laura O'Dell, Hannah Baily, Holly Zimmerman, and Lauren Miller, individually and on behalf of all others similarly situated, (collectively, "Plaintiffs") bring this action against Defendant Aya Healthcare, Inc. ("Aya") alleging breach of contract and various related claims.  Before the Court is: (1) Aya's Motion to Compel Arbitration; (2) Plaintiffs' request for a jury trial on the issue of arbitration; and (3) Aya's *Ex Parte* Application for a Temporary Restraining Order and Request for Preliminary Injunction. The Motion to Compel Arbitration was submitted on the papers without oral argument

-1-

pursuant to Civil Local Rule 7.1(d)(1) and Rule 78(b) of the Federal Rules of Civil Procedure. *See* ECF No. 32. After considering the papers submitted, supporting documentation, and applicable law, the Court: (1) **GRANTS-IN-PART** Aya's Motion to Compel Arbitration; (2) **DENIES** Plaintiffs' request for a jury trial on the issue of arbitration; and (3) **DENIES** *without prejudice* Aya's *Ex Parte* Application for a Temporary Restraining Order and Request for Preliminary Injunction.

## II. BACKGROUND

Plaintiffs' claims against Aya arise from the alleged breach of an employment contract between the parties.

### A. Statement of Facts[1]

To fill travel nursing roles, "healthcare facilities utilize intermediary staffing agencies to employ the travelers, negotiate pay rates, and schedule assignments." ECF No. 15 ("FAC") at 2, ¶ 1. Aya is a Delaware corporation with its principal place of business in San Diego, California and "contracts with healthcare facilities to staff open positions." *Id.* at 4, ¶ 10; 5, ¶ 17. "Aya is offering contracts to travel nurses with a fixed-term assignment at an agreed-upon pay rate." *Id.* at 2, ¶ 2. "Aya knows that in order to accept these assignments, many nurses must give up their current employment, move to the location of the facility (oftentimes out-of-state), secure short-term housing, and incur other travel and housing related costs at their own expense." *Id.* at 6, ¶ 18.

"Aya utilizes form employment agreements for its traveling employees," but "knows that its agreements are premised on false promises and that it does not intend to pay its travel employees the" promised hourly rate. *Id.* at 6, ¶ 20. "After the nurse accepts the position and starts the assignment, Aya makes a 'take-it-or-leave-it' demand to accept less pay or to be terminated." *Id.* "[M]ost nurses have no choice but to continue working the assignment at the lower rate because they have no reasonable alternatives for comparable

---

[1] The majority of the facts set forth herein are taken from Plaintiffs' Complaint. However, the text of the arbitration agreements at issue is taken directly from those agreements.

-2-

3:22-cv-01151-BEN-BLM

employment: they have already incurred travel expenses, secured short-term housing, and uprooted their lives to accept the assignment." *Id.* "Hundreds if not thousands of nurses employed by Aya across the country have reported experiencing mid-contract pay reductions after starting an assignment with Aya, with many reporting that Aya reduced their pay multiple times within the same assignment or slashed their pay by more than 50% or more than originally promised." *Id.* at 2, ¶ 3. In addition to this "bait-and-switch" practice, "Aya is underpaying its travel employees for overtime hours worked" in violation of the law. *Id.* at 3, ¶¶ 4–5.

Employees would receive an email (which is copy and pasted into the FAC) that notifies the employee of pay rate changing mid-contract, and attributing the cause to "hospitalizations leveling out and COVID cases decreasing . . . ." *Id.* at 7, ¶ 22. "[M]any employees whose pay was cut questioned this explanation as they did not work in a COVID unit and the number of COVID cases had no impact on their job responsibilities." *Id.* at 7, ¶ 23. The FAC alleges "there is evidence that hospitals did not actually decrease their bill rates, and Aya simply made this up to justify decreasing the hourly pay rates of its employees, thus increasing its own margins." *Id.* at 7, ¶ 24. "For example, after receiving a pay reduction, multiple Aya employees reported speaking directly with hospital representatives who confirmed that the hospital never decreased the bill rate for the employee's assignment." *Id.* at 7–8, ¶ 24. However, the FAC further alleges that "[e]ven if a hospital did change the bill rate . . . , nothing in Aya's contract permits it to pass along those decreases onto their unsuspecting employees." *Id.* at 8, ¶ 25. The contractually agreed upon pay rate "was not in any way dependent on the actions of a third party or Aya making a pre-determined margin." *Id.*

In certain, limited circumstances, "Aya employees have even been able to confirm their bill rate directly with the hospital and were shocked to learn that Aya's margins were in some instances 65% or higher than what Aya was paying the employee." *Id.* at 8, ¶ 26. When employees have learned of said bill rates, "Aya has threatened staff members at hospitals for disclosing it or taken retaliatory actions against the employees for purportedly

'discussing their pay' in violation of Aya's policies." *Id.* at 8, ¶ 27. The FAC cites an example where a nurse learned about the rates, convinced Aya to agree to pay her more out of Aya's margin, and subsequently received a voicemail from an Aya recruiter stating that they could no longer approve that payout because the nurse had shared her pay with other nurses. *Id.* at 9–10, ¶ 27. The FAC alleges that this conduct of "prohibiting employees from discussing their pay is expressly prohibited by the National Labor Relations Act." *Id.*

When Aya employees refuse to sign revised employment agreements decreasing their pay, "Aya simply proceeds with unilateral pay reductions." *Id.* at 9, ¶ 28. "Aya's pervasive fraud also enables it to compete effectively—albeit unfairly—in the healthcare staffing marketplace." *Id.* at 9, ¶ 29. The FAC alleges that "when Aya must compete with other staffing agencies to fill a travel position, it advertises higher pay packages that are more likely to entice travel employees, knowing that it does not intend to pay that amount after the employees begin the assignment." *Id.* "In certain parts of the country, like San Diego, Aya's reach is becoming so great (through use of exclusive contracts and other means) that if a travel employee refuses to complete an assignment at a reduced rate, the employee will be blacklisted from working at facilities in the region." *Id.* at 10, ¶ 30.

Plaintiffs are all travel nurses who accepted travel work assignments from Aya. *See Id.* at 3–4, ¶¶ 6–9. O'Dell, a citizen of Indiana, "accepted a travel assignment from Aya to work at a healthcare facility located in California." *Id.* at 3, ¶ 6. Bailey, a citizen of Georgia, "accepted a travel assignment from Aya to work at a healthcare facility located in Virginia." *Id.* at 3, ¶ 7. Zimmerman, a citizen of Florida, "accepted a travel assignment from Aya to work at a healthcare facility located in New Jersey." *Id.* at 3, ¶ 8. Miller, a citizen of Washington, "accepted a travel assignment from Aya to work at a healthcare facility located in California." *Id.* at 4, ¶ 9.

Apart from their employment agreement, Aya asked Plaintiffs and other Aya employees to sign a standalone arbitration agreement (the "Arbitration Agreement" or the "Agreement"). *Id.* at 10, ¶ 32. The Arbitration Agreement states:

> You and Aya mutually agree that any and all claims arising out of or relating to your employment with Aya or the end of such employment, whether asserted during or following your employment with Aya, will be subject to binding arbitration and not by a lawsuit or resort to court process.

Ex. 1 to Motion at 6; Ex. 2 to Motion at 9; Ex. 3 to Motion at 12; Ex. 4 to Motion at 15. The Agreement also contains a clause delegating all issues to the arbitrator (the "Delegation Clause" or the "Clause") that states in relevant part:

> The arbitrator shall have the authority to resolve all portions of the dispute, including disputes relating to the interpretation or enforceability of this Agreement . . . .

*Id.* All named Plaintiffs signed the Arbitration Agreement. *Id.*; *see also* Declaration of Laura O'Dell, ECF No. 30-1 ("O'Dell Decl."); Declaration of Hannah Bailey, ECF No. 30-2 ("Bailey Decl."); Declaration of Holly Zimmerman, ECF No. 30-3 ("Zimmerman Decl."); Declaration of Lauren Miller, ECF No. 30-4 ("Miller Decl.").

The FAC alleges that "[b]ecause [many Aya employees] had not reached agreement with Aya on the terms of employment [before signing the Arbitration Agreement], neither party could have understood the scope of their purported agreement to arbitrate disputes 'arising out of or relating to your employment with Aya.'" *Id.* at 11, ¶ 36. "[C]oupled with a vague and undefined dispute resolution process, these [A]rbitration [A]greements lacked mutual assent and did not form a valid contract under California law." *Id.* The FAC further argues that the Agreement also lacks consideration because "Plaintiffs and other Aya employees are giving up the right to sue in court but are not receiving anything—indeed, are losing something—in return." *Id.* at 11, ¶ 37. The FAC ultimately states that "Plaintiffs and other Aya employees were fraudulently induced into entering the [A]rbitration [A]greement." *Id.* at 11, ¶ 38. When Aya asked Plaintiffs to sign the Agreement, "Aya fraudulently concealed the fact that it did not intend to honor the material terms of its employment contracts with Plaintiffs and other Aya employees." *Id.* at 11, ¶ 39. Had

Plaintiffs and other Aya employees known that Aya intended to breach those agreements to pay the contracted rate, they would not have signed the Arbitration Agreement. *Id.* at 12, ¶ 42.

The FAC further alleges that "[i]n calculating the overtime rate paid to its employees, Aya wrongfully excluded from their regular rate various stipends and allowances paid to its employees, including a 'Holiday' pay, 'Charge' pay, 'On Call' pay, 'Call Back' pay, 'Meals and Incidentals Stipend,' and 'Housing Stipend,' even though these payments functioned as a form of compensation as part of its' employees' pay package." *Id.* at 21, ¶ 80. "Each Plaintiff worked more than 40 hours in multiple workweeks during their contracts with Aya during which these forms of compensation were not included in their regular rate of pay in violation of federal and state law." *Id.* at 22, ¶ 81. The Court omits several additional allegations contained in the FAC, general to the alleged class and specific to each individual Plaintiff.

### B. **Procedural History**

On September 27, 2022, Plaintiffs filed a First Amended Complaint, alleging: (1) breach of contract; (2) promissory estoppel; (3) quasi-contract; (4) fraudulent inducement; (5) fraudulent concealment; (6) negligent misrepresentation; (7) violation of state wage payment laws; (8) violation of California Labor Code § 970; (9) violation of California Business & Professions Code § 17200; (10) unpaid overtime under the Fair Labor Standards Act; (11) violation of state overtime statutes; (12) violation of California Labor Code § 204; (13) failure to pay overtime premium in violation of California Labor Code §§ 510, 1194; (14) failure to furnish accurate wage statements in violation of California Labor Code §§ 226, 1174, 1175; (15) failure to pay wages due on discharge resignation in violation of California Labor Code §§ 201–204; and (16) enforcement of the California Labor Code Private Attorneys General Act of 2004. *See generally* FAC.

On October 7, 2022, Aya filed the instant Motion to Compel Arbitration. ECF No. 21 ("Motion"). On October 31, 2022, Plaintiffs filed an Opposition to the Motion to Compel. ECF No. 30 ("Oppo."). On November 7, 2022, Aya filed a Reply. ECF No. 33

1  ("Reply").  On April 7, 2023, Plaintiffs filed a Notice of Supplemental Authority.  ECF
2  No. 62.
3        On October 28, 2022, Aya filed an *Ex Parte* Application for a Temporary
4  Restraining Order.  ECF No. 29.  ("*Ex Parte* App.").  On November 4, 2022, Plaintiffs
5  filed an Opposition to the *Ex Parte* Application.  ECF No. 31 ("*Ex Parte* Oppo.").  On
6  November 11, 2022, Aya filed a Reply.  ECF No. 34.
7  **III.   DISCUSSION**
8        Aya seeks to compel arbitration of the claims in this action based on Plaintiffs'
9  signed Arbitration Agreements.  Aya also seeks dismissal of Plaintiff O'Dell's non-
10  individual claim made pursuant to the California Private Attorneys General Act of 2004
11  ("PAGA"), Labor Code §§ 2698–2699.5.  Plaintiffs counter that the Arbitration
12  Agreements are neither valid nor enforceable because Plaintiffs were fraudulently induced
13  into signing them.  Plaintiffs further argue that O'Dell's non-individual PAGA claim
14  should not be dismissed.  Based on the language of the Delegation Clause in the Arbitration
15  Agreement, the Court cannot decide threshold issues of validity and enforceability and
16  therefore, compels arbitration on the arbitrability of Plaintiffs' claims.
17      **A.**   **Jurisdiction**
18        The FAA allows a party aggrieved by another party's failure to arbitrate to bring
19  either an original petition to arbitrate, or where an action has already been filed, a motion
20  to compel arbitration "in any United States district court which, save for such agreement,
21  would have jurisdiction under title 28, in a civil action . . . of the subject matter arising out
22  of the controversy between the parties."  9 U.S.C. § 4.  Under 28 U.S.C. § 1331, "district
23  courts . . . have original jurisdiction of all civil actions arising under the Constitution, laws,
24  or treaties of the United States."
25        Here, the Court has subject matter jurisdiction pursuant to the Class Action Fairness
26  Act, 28 U.S.C. § 1332(d).  The Court also has original subject matter jurisdiction pursuant
27  to 28 U.S.C. § 1331, based on Plaintiffs' Fair Labor Standards Act ("FLSA") claims, as
28  well as supplemental jurisdiction over the related state claims pursuant to 28 U.S.C. § 1367.

Accordingly, the Court has jurisdiction to hear Aya's Motion to Compel Arbitration.

### B.     Governing Law

As a preliminary matter, federal substantive law governs the scope of an arbitration agreement. *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013). "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.,* 207 F.3d 1126, 1131 (9th Cir. 2000).  State contract law, on the other hand, governs issues pertaining to the validity, revocability, and enforceability of an agreement to arbitrate. *See, e.g.*, *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 716–17 (9th Cir. 2020) (applying California contract law to a wireless services agreement because the agreement's choice-of-law provision states that the contract is governed by the law of the state in which the customer's billing address is located, and the customer resided in California).  Neither party necessarily argues which state law governs, but both parties reference California.  As such, the Court will apply California law to contractual issues.

### C.     Federal Arbitration Act

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the revocation of a contract," 9 U.S.C. § 2.  The FAA provides that once a defendant files a motion to compel arbitration, a district court must "hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not" at issue, must "make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.  It "reflects both a 'liberal federal policy favoring arbitration' . . . and the 'fundamental principle that arbitration is a matter of contract.'"  *Kramer*, 705 F.3d at 1126 (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)).

The district court's role in ruling on a motion to compel arbitration is "limited to determining (1) whether a valid agreement to arbitrate exists[,] and if it does, (2) whether the agreement encompasses the dispute at issue." *Revitch*, 977 F.3d at 716. Only if the court answers both questions in the affirmative will the FAA require the Court "to enforce the terms of the arbitration agreement in accordance with its terms." *Id*. The Supreme Court has instructed that "courts should order arbitration of a dispute only where the court is satisfied that neither [1] the formation of the parties' arbitration agreement *nor* [2] (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (emphasis in original).

Subject to certain exceptions, the FAA "governs arbitration agreements in contracts involving interstate commerce." *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1058–60 (9th Cir. 2020) (applying Arizona contract law). Section 1 of the FAA defines "commerce" as "commerce among the several States." 9 U.S.C. § 1. The Court finds the Arbitration Agreement here involves interstate commerce. As argued by Aya, the Arbitration Agreement has "an undeniable nexus to interstate commerce because" it is connected to Plaintiffs' employment with Aya as traveling clinicians. *See* Motion at 10–11. Aya employees are dispatched to work at different healthcare facilities throughout country. Plaintiffs do not challenge Aya's argument,[2] and the Court agrees. As such, the Arbitration Agreement involves interstate commerce.

**D.    Fraudulent Inducement**

Under California law, "the elements of fraud . . . are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c)

---

[2]    Where a non-moving party fails to address an argument raised by the moving party in his opposition brief, the Court may consider any arguments unaddressed by the non-moving party as waived. *See Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1178 n.7 (9th Cir. 2016) (noting that "the plaintiffs did not raise that argument to the district court in their ... opposition to the defendants' motion for summary judgment, so the argument was waived."); *see also* S.D. Cal. Civ. R. 7.1.

intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996) (internal quotation and citation omitted). Fraudulent inducement constitutes a subspecies of fraud. *Id.*

Aya argues that no evidence exists to substantiate the allegations that Plaintiffs were fraudulently induced into signing the Arbitration Agreements. Motion at 14. Aya argues that the FAC states how Aya's alleged misrepresentation concerned the contractual pay rate, but that this argument fails because the Arbitration Agreements were executed separately. *Id.* at 15. Aya maintains that "[i]f Plaintiffs wish to pursue fraud claims regarding their pay rates, they must do so in arbitration." *Id.* Aya also argues that "[f]raud or illegality in inducement of a principal contract, *i.e.*, an employment agreement, does not operate to nullify an agreement to arbitrate." *Id.* Aya argues that this is true regardless of whether there is an arbitration clause or a separate arbitration agreement. *Id.* Aya argues the allegation of fraud must center on the arbitration provision and not another portion of the contract. *Id.* Aya contends that here, "Plaintiffs allege fraud with respect to an entirely different agreement, their offer letters." *Id.* at 16.

Plaintiffs argue that the Arbitration Agreement as a whole, and the Delegation Clause therein, satisfy all elements required to show fraudulent inducement. Motion at 16. Plaintiffs argue that "Aya withheld a critical fact: it already intended to change their pay rates mid-contract." *Id.* "That concealed information would have been material to Plaintiffs' consideration of Aya's required dispute resolution provisions." *Id.* Plaintiffs argue that they had "a reasonable expectation that Aya would honor its obligations under their separate employment agreements." *Id.* at 17. "That reasonable—and legally supported—expectation naturally informed the Plaintiffs' decisions whether to enter into a dispute resolution agreement that would impose serious restrictions on how and where they may seek redress for their injuries, including, via the [D]elegation [Clause], by attempting to entirely deprive them of any access to a public forum." *Id.* Plaintiffs elaborate that this would have been material because despite the advantages of arbitration, there are several disadvantages for employees. *Id.* Plaintiffs argue that here, "the 'Arbitration Agreement'

asked the Plaintiffs to waive their right to a jury trial, to a class collective, or representative action, and, effectively, via the delegation provision, to any public forum." *Id.* Plaintiffs make additional but overlapping arguments.[3]

As an initial matter, the Court must address whether the Arbitration Agreement delegates arbitrability to the arbitrator. "[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010). Where the parties to an arbitration agreement "clearly and unmistakably" agree that an arbitrator will decide gateway issues, the arbitrator, rather than the Court, will decide those issues. *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). "Such [c]lear and unmistakable evidence of agreement to arbitrate arbitrability might include . . . a course of conduct demonstrating assent . . . or . . . an express agreement to do so." *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011) (citations and internal quotation marks omitted). "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract" and "possesses no power to decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019). This remains "true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Id.* at 529.

---

[3] Plaintiffs argue Aya knew of its intent and that this is demonstrated by the record of Aya failing to disclose this information. *Id.* at 19. Plaintiffs point to their allegations that Aya maintained secrecy around its pay-rate changes, that the hospital never changed its bill rate for Plaintiffs' work, that Aya threatened staff members at hospitals for disclosing bill rates, and that Aya took retaliatory action against employees who discussed pay rates. *Id.* Plaintiffs further point out that even though the Arbitration Agreement was a stand-alone contract, signing the Agreement was a condition of Plaintiffs' employment. *Id.* at 19–20. Finally, Plaintiffs argue that "at the time they entered the stand-alone arbitration agreements with Aya, they did not know of Aya's intention to breach their separate employment contracts." *Id.* at 20. Plaintiffs argue that had they known, "they would not have agreed to an arbitration agreement that entirely deprived them of access to a public, judicial forum, including by delegating even threshold issues of arbitrability to the arbitrator. *Id.*

The Delegation Clause contained in the Arbitration Agreement and at issue in this case states:

> The arbitrator shall have the authority to resolve all portions of the dispute, including disputes relating to the interpretation or enforceability of this Agreement, and may utilize procedural motions challenging the legal sufficiency of a claim or defense, such as summary judgment motions, motions for judgment on the pleadings, requests for preliminary injunctions or equitable relief, and similar proceedings.

Ex. 1 to Motion at 6; Ex. 2 to Motion at 9; Ex. 3 to Motion at 12; Ex. 4 to Motion at 15. Here, the language of the Delegation Clause clearly and unmistakably delegates to the arbitrator questions of arbitrability, because it expressly states that the arbitrator has the "authority to resolve all portions of the dispute, including disputes relating to the interpretation or enforceability of this Agreement . . . ." *Id.*; *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) ("[T]he question [of] 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter."). Plaintiffs are attempting to avoid arbitration by arguing the Agreement is unenforceable based on fraudulent inducement, but for the reasons set forth below, even that decision must be made by the arbitrator.

In *Henry Schein*, the Supreme Court held that valid clauses delegating arbitrability must be enforced. 139 S. Ct. at 529–30. "[B]efore referring the dispute to an arbitrator, the court determines whether a valid arbitration agreement [delegating arbitrability] exists." *Id.* at 529 (citing 9 U.S.C. § 2). In addition to evaluating the terms of the agreement, "courts may examine a course of conduct demonstrating assent . . . ." *Erwin v. Citibank, N.A.*, No. 16-cv-03040-GPC-KSC, 2017 WL 1047575, at *4 (S.D. Cal. Mar. 20, 2017) (citing *Momot*, 652 F.3d at 988). However, because the text of the Arbitration Agreement expressly delegates arbitrability, as held in *Rent-A-Ctr.*, the Court must be careful to only address challenges to Delegation Clause and not the Arbitration Agreement as a whole, or other employment contracts at issue in this case. 561 U.S. 63, 72 (2010)

("Section 2 [of the FAA] operates on the specific 'written provision' to 'settle by arbitration a controversy' that the party seeks to enforce. Accordingly, unless [the party opposing arbitration] challenged the delegation provision specifically, we must treat it as valid under § 2, and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator."). If the Clause is valid, all remaining validity challenges must be arbitrated.

Here, Plaintiffs' primary argument is that the Delegation Clause in the Arbitration Agreement is invalid because Aya concealed the alleged fact that it would modify Plaintiffs' agreed upon pay rates mid-contract. As an initial matter, Plaintiffs all admit that they voluntarily signed the Arbitration Agreement containing the Delegation Clause. *See* Exs. 1, 2, 3, and 4 to Motion; O'Dell Decl. at 2–3; Bailey Decl. at 2–3; Zimmerman Decl. at 2–3; Miller Decl. at 2–3. Plaintiffs' signatures on the Arbitration Agreement also constitute "objective evidence of [their] assent to its terms." *Al-Thani v. Wells Fargo & Co.*, No. C 08-1745 CW, 2009 WL 55442, at *6 (N.D. Cal. Jan. 7, 2009) (citing *Marin Storage & Trucking, Inc. v. Benco Contracting and Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1049 (2001)).

Plaintiffs now seek to rescind their consent to arbitrate and delegate arbitrability, based on Aya's alleged misrepresentation regarding pay rates. However, this argument goes to the employment agreement/offer letter setting the pay rate, and the not the separately executed Arbitration Agreement containing the Delegation Clause. The only other arguments respecting the Delegation Clause are that Plaintiffs were deprived of any access to a public forum and had they known their pay rates would decline, they would not have agreed to the Clause. But this does not raise any alleged misrepresentation—or any issue for that matter—specific to the language of the Delegation Clause. Instead, Plaintiffs are pointing to an alleged misrepresentation regarding a separate agreement governing their pay. *See Rent-A-Ctr.*, 561 U.S. at 86 ("A claim that an entire arbitration agreement is invalid will not go to the court unless the party challenges the particular sentences that delegate such claims to the arbitrator, on some contract ground that is particular and unique

to those sentences."). Without a true challenge to the formation or validity of the Delegation Clause, Plaintiffs are "bound to pursue [their] validity claim in arbitration." *Id.* at 87.

Finally, each Plaintiff states in their declaration: "Had I known that a dispute about my employment was near certain to arise, because Aya was in the practice of causing disputes to arise, I would not have signed the arbitration agreement or its delegation provision." O'Dell Decl. at 3; Bailey Decl. at 3; Zimmerman Decl. at 3; Miller Decl. at 3. This statement is undercut by the fact that Plaintiffs were signing an agreement specifically designed to address disputes between them and Aya, and giving up certain rights in doing so. Unfortunately for Plaintiffs, Aya's alleged failure to act in good faith constitutes a dispute and whether that dispute is arbitrable must be decided by the arbitrator. Because Plaintiffs voluntarily consented to the Arbitration Agreement, they cannot choose which disputes go to the arbitrator. The Court is bound by the Delegation Clause.

### E. Discovery and an FAA Jury Trial

Plaintiffs argue "they have presented evidence sufficient to prove they were fraudulently induced to sign the 'Arbitration Agreements' and their delegation provisions, rendering them unenforceable." Oppo. at 21. At minimum, Plaintiffs argue they have raised a genuine dispute of material fact. *Id.* As such, Plaintiffs ask the Court to order arbitration-related discovery "in the event the Court declines to outright deny the Motion to Compel Arbitration at this stage." *Id.* Plaintiffs argue they have already sent arbitration-related requests for production of documents to Aya that go to the heart of this motion . . . ," and "[t]o date, Aya has not responded." *Id.* Plaintiffs further argue the Court should compel Aya to respond to this discovery.

Aya replies that "[f]or purposes of this Motion, it is undisputed that Plaintiffs signed the Arbitration Agreements in question and understood what they were signing." Reply at 6. Aya contends that as such, "there is no factual dispute as to whether Plaintiffs knowingly entered agreements to arbitrate their claims." *Id.* Aya further contends that "Plaintiffs do not testify that Aya made any false representations regarding arbitration that induced

Plaintiffs to sign the Arbitration Agreements." *Id.* at 7. Instead, "Plaintiffs claim they never would have signed the Arbitration Agreements if they knew they would be involved in a dispute with Aya regarding their employment contracts." *Id.* Aya argues that "[t]his retrospective desire to rescind their Arbitration Agreement falls far short of the legal standard required for discovery." *Id.* The Court agrees.

Section 4 of the FAA states that "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. As set forth by the Ninth Circuit, a trial is required only where there are disputes of material fact concerning the formation of the arbitration agreement. *See Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 672 (9th Cir. 2021) ("To implement this language, once a district court concludes that there are genuine disputes of material fact as to whether the parties formed an arbitration agreement, the court must proceed without delay to a trial on arbitrability and hold any motion to compel arbitration in abeyance until the factual issues have been resolved.").

Here, Plaintiffs have set forth little evidence that they were fraudulently induced into consenting to the Arbitration Agreement, let alone the Delegation Clause. All evidence presented by Plaintiffs points to the formation of the employment agreements/offer letters setting Plaintiffs' pay rates, and Aya's subsequent reductions of those rates. To proceed, there must be factual disputes specific to the formation of the Delegation Clause. As set forth above, Plaintiffs consented to the Arbitration Agreement containing the Delegation Clause. Even if Plaintiffs were to gather discovery or additional evidence of Aya's alleged misrepresentation regarding pay rates, this evidence would not create a dispute of material fact as to the Delegation Clause specifically. It would only serve to create factual disputes surrounding the employment agreements/offer letters. In fact, Plaintiffs point to no discovery whatsoever that could potentially invalidate the Delegation Clause and therefore, discovery is unnecessary. Accordingly, the Court finds no disputes of material fact warranting a FAA jury trial. As such, Plaintiffs' request is **DENIED**.

### F. <u>Individual PAGA Claims</u>

The parties make numerous arguments regarding Plaintiff O'Dell's individual and non-individual PAGA claims and whether they should be dismissed, referred to arbitration, or allowed to proceed. Motion at 20–24; Oppo. at 22–25. However, neither party addresses why or how the Court can decide these issues in light of the Delegation Clause. Again, the Clause authorizes the arbitrator to "resolve all portions of the dispute, including disputes relating to the interpretation or enforceability of this Agreement . . . ." Ex. 1 to Motion at 6; Ex. 2 to Motion at 9; Ex. 3 to Motion at 12; Ex. 4 to Motion at 15. Whether the Arbitration Agreement is enforceable as to the PAGA claims remains a question of enforceability delegated to the arbitrator. The Arbitration Agreement is also subject to interpretation over the waiver of representative actions with respect to O'Dell's non-individual PAGA claim. Because the Court cannot decide whether or not O'Dell's individual PAGA claim is subject to arbitration, it cannot decide whether the non-individual PAGA claim should be dismissed. Aya relies primarily on the Supreme Court's decision in *Viking River Cruises, Inc. v. Moriana*, in making its PAGA arguments, which Plaintiffs dispute. 142 S. Ct. 1906, 1910, *reh'g denied*, 143 S. Ct. 60 (2022). However, *Viking River* did not involve a delegation clause, and the Supreme Court made clear in *Rent-A-Ctr.*, that this Court cannot decide issues that have been expressly delegated to the arbitrator. 561 U.S. at 72.

As stated above, the Arbitration Agreement clearly and unmistakably delegates the issue of arbitrability to the arbitrator and therefore, the Court does not entertain the parties' PAGA arguments. *See Levin v. Caviar, Inc.*, No. 15-cv-01285-EDL, 2016 WL 270619, at *3 (N.D. Cal. Jan. 22, 2016) (declining to decide PAGA issue and holding that "[w]here, as here, the parties have clearly and unmistakably delegated the issue of arbitrability to the arbitrator, the Court will not make that determination."). Accordingly, the arbitrability of O'Dell's PAGA claims are subject to arbitration.

### G. **Dismissal**

Where a plaintiff files suit "in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for . . . arbitration, the court in which such suit is pending, upon being satisfied that the issue . . . is referable to arbitration . . . shall on application of one of the parties stay the trial of the action until such arbitration." 9 U.S.C. § 3. A court's power to stay proceedings is incidental to the inherent power to control the disposition of its cases in the interests of efficiency and fairness to the court, counsel, and litigants. *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936). A stay may be granted pending the outcome of other legal proceedings related to the case in the interests of judicial economy. *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863–64 (9th Cir. 1979). Discretion to stay a case is appropriately exercised when the resolution of another matter will have a direct impact on the issues before the court, thereby substantially simplifying the issues presented. *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983). In determining whether a stay is appropriate, a district court "must weigh competing interests and maintain an even balance." *Landis*, 299 U.S. at 254–55. "[I]f there is even a fair possibility that the stay . . . will work damage to some one else, the stay may be inappropriate absent a showing by the moving party of hardship or inequity." *Dependable Highway Express, Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007) (citation and internal quotation marks omitted).

Here, because the parties delegated the issue of arbitrability to the arbitrator, the Court has not decided which, if any, of Plaintiffs' claims are subject to arbitration on the merits. The authority to decide whether any claims fall within the scope of the Arbitration Agreement and whether the Agreement is enforceable, has been expressly delegated to the arbitrator. In the interest of justice and in order to avoid duplicative proceedings, the Court finds a stay of the claims against Aya is proper under the circumstances here, pending a decision on the arbitrability of Plaintiffs' claims. Accordingly, the Court **DENIES** Aya's request to dismiss the action and instead, **STAYS** the litigation. Plaintiffs and Aya must file a Joint Status Report **within ten (10) days** of the arbitrator's decision regarding the

arbitrability of Plaintiffs' claims.

### H. *Ex Parte* Application

Aya's *Ex Parte* Application argues that Plaintiffs' counsel, Stueve Siegel, "has violated federal and state law by improperly soliciting clients to join this action using misleading, unauthorized and unethical communications." *Ex Parte* App. at 7. Aya argues that Mr. Siegel "has collected numerous Consents to Join without consulting the recipients of the communications regarding their potential claims, providing notices and disclaimers required by federal and state law, or performing any due diligence whatsoever into the truth of the representations in the online questionnaires." *Id.* at 7–8. Aya argues that Mr. Siegel's premature dissemination of notice to putative class members is causing irreparable harm to Aya by making it virtually impossible for Aya to defend this litigation or participate in a fair judicial process." *Id.* at 8. Aya further argues that these unauthorized communications constitute improper discovery, because the parties are not authorized to engage in discovery until they have conferred regarding a discovery plan. *Id.* at 21–22. As such, Aya "requests the Court issue a temporary restraining order ("TRO") enjoining Stueve Siegel from any further communication with current and former Aya employees that it does not currently represent without prior authorization from the Court." *Id.* at 8. Plaintiffs respond with several arguments justifying Mr. Siegel's conduct. *See generally Ex Parte* Oppo.

As set forth above, all claims are now compelled to arbitration for a ruling on arbitrability, and the entirety of this litigation is stayed. As such, the *Ex Parte* Application is **DENIED** *without prejudice*.

### IV. CONCLUSION

For the above reasons, the Court rules as follows:

1. Aya's Motion to Compel Arbitration is **GRANTED-IN-PART**. All of Plaintiffs claims are **COMPELLED** to arbitration on the issue of arbitrability.

2. Plaintiffs' request for an FAA jury trial is **DENIED**.

3. Aya's request to dismiss certain claims is **DENIED** and instead, the litigation

-18-

is **STAYED**.

4. Aya and Plaintiffs must file a Joint Status Report **within ten (10) days** of the arbitrator's decision regarding arbitrability.

5. A Status Conference is set for **July 31, 2023** at **10:30 a.m.** in Courtroom 5A to formally review the status of the stay.

6. Aya's *Ex Parte* Application for a Temporary Restraining Order and Preliminary Injunction is **DENIED** *without prejudice*.

**IT IS SO ORDERED.**

DATED: April 27, 2023

**HON. ROGER T. BENITEZ**
United States District Judge